AO 106 (Rev. 01/09) Application for a Search Warrant

FILED
MAR 06 2017
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Facebook Inc, 1601 Willow Road, Menlo Park, CA
For Records to Facebook User ID:
https://facebook.com/100001504852662

Case No. 17MJ0664

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the Northern District of California *(identify the person or describe property to be searched and give its location)*: see Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*: see Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 21 U.S.C. § 952,960,963 , and the application is based on these facts: See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: __________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Stirling Campbell, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/3/17

[signature]
*Judge's signature*

City and state: San Diego, CA

Karen S. Crawford, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Stirling A. Campbell, being duly sworn, declare and state:

## INTRODUCTION

1. This affidavit supports an application to search the following:

a. one Facebook account with User ID **https://facebook.com/100001504852662** (the "**Facebook Account**") used by defendant Alejandro MORA-Munoz ("MORA") and more particularly described in Attachment A, incorporated herein.

2. Based on the information below, I have probable cause to believe that the **Facebook Account** described in paragraph 1 and Attachment A contains evidence of a crime, or is property designed, intended, or used in the commission of a crime. Specifically, I have probable cause to believe that within the **Facebook Account** is evidence of violations of Title 21, United States Code Sections 841, 846, 952, 960, and 963.

3. The evidence to be searched for and seized is described in Attachment B, incorporated herein. The **Facebook Account** is currently in the possession of Facebook, Inc. located at 1601 Willow Road, Menlow Park, CA 94025.

4. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of drug smuggling, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts or have had them related to me by persons mentioned in this affidavit, or have reviewed reports created by them. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Facebook Account**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates and times are approximate.

**EXPERIENCE AND TRAINING**

5. I have been employed as a Special Agent with HSI since October 21, 2005. I am presently assigned to the HSI San Diego Child Exploitation Group. During my years as a Special Agent, I have investigated various drug crimes that include, but not limited to, conspiracy, importation, and possession with intent to distribute, in violation of Title 21, United States Code, Sections 841, 846, 952, 960, and 963. Prior to joining HSI, I was employed as a DHS Customs and Border Protection Officer ("CBPO") from August 11, 2003, to October 21, 2005. I received a bachelor's degree in economics from the University of California, San Diego. During my time as a Special Agent, I have received specialized training in the investigation and prosecution of drug violations. I attended the Federal Law Enforcement Training Center in Glynco, Georgia, where I attended the Criminal Investigator Training Program and the ICE Special Agent Training Program. My training course included, but was not limited to, criminal law, constitutional law, and enforcement techniques, including but not limited to, undercover operations and search warrants. I have received training in all aspects of conducting drug investigations. I am familiar with drug traffickers' methods of operation including the distribution, storage, and transportation of drug and the collection of money proceeds of drug trafficking. As a result of over thirteen years of law enforcement experience, I have personally arrested or participated in the arrest of over 300 persons for violations of various federal and state drug laws. In over half of these cases, I conducted interviews with the arrested persons and with their associates.

6. By virtue of my employment and experience as a Special Agent with HSI, I have performed various tasks, which include, but are not limited to:

a. Functioning as a surveillance agent and thereby observing and recording movements of persons trafficking in controlled substances and those suspected of trafficking in controlled substances;

b. Participating in the tracing of monies and assets gained by controlled substance traffickers from the illegal sale of controlled substances and/or the laundering of monetary instruments;

c. Interviewing witnesses, cooperating individuals, and informants relative to the illegal trafficking of controlled substances and the distribution of monies and assets derived from the illegal trafficking of controlled substances (laundering of monetary instruments); and

d. Functioning as a case agent, which entails the supervision of specific investigations involving the trafficking of drugs and the laundering of monetary instruments.

7. Through the course of my training, experience, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for drug smugglers to work in concert with other individuals and to do so by utilizing social networking and messaging applications like Facebook through digital devices like tablets, cellular telephones, and computers, to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distribution amount quantities of hard drugs, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling controlled substances across the border are in digital or telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Drug smugglers and their organizations use cellular and digital devices, in part, because these individuals believe law enforcement cannot track the originating and destination communications.

8. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in drug smuggling

investigations, I am also aware that:

a. Drug smugglers will use social networking and messaging services on different electronic devices because it allows access to send instant messages and communicate with other individuals in addition to the standard use of cellular phones to make telephone calls, text, web, and voice messages;

b. Drug smugglers will use social networking and messaging services because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

c. Drug smugglers and their accomplices will use social networking and messaging services features because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d. Drug smugglers will use social networking and messaging services to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e. Drug smugglers will use social networking and messaging services to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

f. The use of social networking and messaging services by smugglers tends to generate evidence that is stored on the social media account, including, but not limited to chats, instant messages, photographs, contact lists, IP addresses, connected social network accounts, and location data.

## BACKGROUND ON FACEBOOK

9. Facebook is a corporation headquartered in Menlo Park, California. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share

written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

11. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

12. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from

Facebook.

13. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

15. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are

typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

16. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

17. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

18. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

19. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

20. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the

account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement). Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INVESTIGATIVE RESULTS**

21. On December 7, 2016, at approximately 12:23 p.m., during primary operations CBPO Tom Phrakonekham made contact with MORA as he approached his booth on primary lane #21. MORA presented CBPO Phrakonekham with his DSP-150 visa card. CBPO Phrakonekham obtained two negative customs declarations from MORA, indicating he was not bringing anything with him into the United States.

22. MORA stated that he was going shopping in Chula Vista, CA. CBPO Phrakonekham noticed MORA appeared to be anxious and in a hurry. CBPO Phrakonekham conducted crossing history queries on the car and MORA and observed few historical crossings. CBPO Phrakonekham requested that a Canine

Enforcement Officer ("CEO") screen MORA's vehicle with his assigned canine. CBPO Phrakonekham asked MORA for the key and told him to place his hands on the steering wheel.

23. CEO David Mateos was conducting primary operations with his assigned Narcotics Human Detector Dog ("NHDD"). The NHDD alerted to the rear bumper of the vehicle. While CEO Mateos was at the trunk area of the vehicle, CBPO Phrakonekham walked over and inspected under side of the rear bumper. CBPO Phrakonekham noticed the bumper area appeared odd looking. CBPO Phrakonekham referred the vehicle to the secondary lot for further inspection. MORA was handcuffed for officer safety reasons.

24. In the vehicle secondary lot, CBPO Miguel Gonzalez conducted an intensive inspection of the vehicle. During the inspection, CBPO Gonzalez examined the rear bumper and observed signs of tool marks on the rear panel indicating that it had been tampered with. CBPO Gonzalez removed the rear bumper and observed packages inside. CBPO Gonzalez discovered approximately ten packages, wrapped in plastic wrap. CBPO Gonzalez probed one of the packages and discovered a crystalline substance. CBPO Gonzalez then conducted a field-test on a sample of the substance. The substance field-tested positive for methamphetamine.

25. A further search of the vehicle on December 8, 2016, at approximately 3:00 a.m., discovered further anomalies in the vehicle's rocker panels. CBPOs cut into the rocker panels and discovered additional packages. CBPO Kevin Bridgewater was assigned to the further inspection of the vehicle. CBPO Bridgewater removed seven packages from each of the rocker panels. A total of fourteen packages were discovered during the second examination. CBPO Bridgewater probed one of the packages and discovered a crystalline substance. CBPO Bridgewater then conducted a field-test on a sample of the substance. The

substance field-tested positive for methamphetamine.

26. CBPOs discovered a total of twenty-four packages of methamphetamine weighing a total of 28.38 kilograms (62.44 pounds). The 28.38 kilograms of methamphetamine was seized as evidence.

27. Post-arrest, MORA was advised of his *Miranda* rights and elected to make a statement. MORA denied knowledge of the drugs and stated that a friend had given him the vehicle and he was supposed to drop it off at a McDonald's after crossing the border.

28. Incident to the arrest of MORA, CBPOs seized a smartphone. A smart phone is a mobile phone with advanced mobile operating system that combines features of a computer operating system with other features useful for mobile use. The smartphone was later turned over to the custody of HSI. MORA acknowledged to HSI agents that the smartphone was his. Agents briefly viewed the smartphone, but the battery died soon after. They also did not download information from the smartphone at the Port of Entry incident to MORA's arrest and a forensic search of this device, pursuant to a search warrant, is still pending.

29. On December 29, 2016, I conducted a telephonic interview with MORA's mother utilizing an interpreter. MORA's mother stated that MORA is friendly and has used social media but did not add her as a friend.

30. On February 7, 2017, I received transactional data and emails for MORA from the Metropolitan Correctional Center. A review of the emails reflected that on February 1, 2017, MORA emailed an individual and provided his Facebook name as "alex" and "Alejandro Mora OG."

31. On February 16, 2017, I conducted a search of the name "Alejandro MORA OG" on Facebook profiles that are open to the public. Results for the search on the name returned a link to the **Facebook Account** and the alternative listing as https://facebook.com/alex.moramunoz when selected.

32. A review of the main page of the Facebook account shows the name "Alejandro Mora OGs" with nickname "Moradrug" under it. I examined "Contact and Basic Info" tab for the account and discovered the same date of birth that MORA that provided to agents during his arrest on December 7, 2016. Under the "Overview" tab, I discovered Ensenada Blanca, Baja California, Mexico where MORA stated he was from.

33. I also viewed public posts on this account. They included a post by "Alejandro Mora OG" on November 6, 2016, that appeared to reference marijuana smuggling. Specifically, the post (translated by Facebook software into English) stated "From Mexico to USA 99 % impossible to weed so bring her in the ass dogs you migrate the smell… de usa to Mexico 99 % possible to bring wid you don't even check."

34. Based upon my experience and investigation, in this case, I believe that MORA, as well as other persons known and as yet unknown, was involved in an on-going conspiracy to import, transport, possess, and import and distribute methamphetamine into the United States. Based on my experience investigating drug smugglers, I also believe that MORA used the social networking the Facebook Account to coordinate with co-conspirators regarding the transportation and delivery of the methamphetamine and to otherwise further this conspiracy both inside and outside the United States.

35. I also know that recent calls made and received, phone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of electronic devices described herein, which identify other persons involved in drug trafficking activities.

36. Based on my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the

facts and opinions set forth in this affidavit, I believe that information relevant to the methamphetamine smuggling of MORA, and co-conspirators, such as phone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the electronic devices described herein.

**PRIOR ATTEMPTS TO OBTAIN DATA**

37. The United States has downloaded posts, photographs, and information from public portions of the **Facebook Account**. However, as explained below, not all the information requested will be available through this method.

**GENUINE RISKS OF DESTRUCTION**

38. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

39. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook. The impact on Facebook's business would be severe.

40. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of

communications) particularly described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, government-authorized persons will review that information to locate the items described in Section III of Attachment B.

41. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the segregation and extraction of data will complete the analysis and provide the data authorized by this warrant to the investigating team within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

42. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

43. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification, segregation and extraction of data within the scope of this warrant.

//

//

//

//

//

//

//

//

## CONCLUSION

44. In conclusion, based upon the information contained in this affidavit, I have reason to believe that evidence, fruits and instrumentalities relating to violations of Title 21, United States Code Sections 841, 846, 952, 960, and 963, are located at the location described in Attachments A.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Stirling A. Campbell
Special Agent, HSI

Subscribed and sworn to before me this 3rd day of February, 2017.

United States Magistrate Judge

**KAREN S. CRAWFORD**

# ATTACHMENT A

This warrant applies to information associated with the **Facebook user ID https://facebook.com/100001504852662** that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

# ATTACHMENT B

I. Service of Warrant

The officer executing the warrant shall permit Facebook, as custodian of the computer files described in Section II below, to locate the files relevant to Attachment A and copy them onto removable electronic storage media and deliver the same to the officer or agent.

II. Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a. All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the

groups' Facebook group identification numbers; future and past event postings; comments; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All past and present lists of friends created by the account;

i. The types of service utilized by the user;

j. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

k. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

III. Information to be seized by the government

The search of the data supplied by Facebook pursuant to this warrant will be conducted by ATF as provided in the "Procedures For Electronically Stored Information" of the Affidavit submitted in support of this search warrant and will be limited to the period of November 30, 2016 to December 14, 2016, and to the seizure of:

a. Communications, records, posts, and attachments tending to indicate efforts to smuggle or otherwise import or deliver controlled substances from Mexico to the United States or within the United States;

b. Communications, records, posts, and attachments tending to identify co-conspirators, criminal associates, or others involved in efforts to smuggle or otherwise import or deliver controlled substances from Mexico to the United States or within the United States;

c. Communications, records, posts, and attachments tending to discuss, depict, or establish the ownership, possession, dominion and control of the Facebook Account described in Attachment A;

d. Communications, records, posts, and attachments tending to identify travel to or presence at locations involved in efforts to smuggle or otherwise import or deliver controlled substances from Mexico to the United States or within the United States;

e. Communications, records, posts, and attachments that provide context to any communications described above, such as electronic mail, messages, or posts sent or received in temporal proximity to any relevant communication;

which are evidence of violations of Title 21, United States Code Sections 841, 846, 952, 960, and 963.